## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| BRUCE C. TURNER, | : | |
| individually on behalf of himself | : | |
| and all others similarly | : | CIVIL NO.: |
| situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | CLASS ACTION |
| v. | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| DR. ING. H.C.F. PORSCHE AG, | : | |
| PORSCHE CARS NORTH | : | |
| AMERICA, INC., | : | |
| Defendants. | : | |

_____:_____

### CLASS ACTION COMPLAINT

Plaintiff Bruce C. Turner brings this action on his own behalf and on behalf of all others similarly situated, and, based on knowledge with respect to his own actions and upon information and belief with respect to all other matters, alleges as follows:

### INTRODUCTION

1.       In mid-November 2020, Defendants Dr. Ing. h.c.F. Porsche AG and Porsche Cars North America, Inc. (collectively "Porsche" or "Defendants") quietly issued a corporate "stop sale order" (the "Stop Sale Order") on a broad range of high performing luxury vehicles built between 2012 and 2018, including certain 911, Boxster, Cayman, Cayenne, and Panamera models that were equipped with the add-on, expensive, and sought-after "Sport Chrono Package" ("Class Vehicles," as specifically identified by model and model year(s) *infra*). Porsche has recently admitted that a number of its vehicles "may" pollute beyond acceptable levels when driven in "Sport Plus" mode, which is available on Porsche models equipped with the Sport Chrono Package. The Stop Sale

1

Order thus forbids Porsche's 191 United States dealerships from selling any Class Vehicles, indefinitely. The Order also prevents Plaintiff and the Class from utilizing the largest marketplace—the Porsche dealership network and its owned and operated "Porsche Finder" tool—to sell their Class Vehicles for their retained value, which Porsche promotes as an important benefit to vehicle owner.

2.      When an automaker issues a "stop sale" on vehicles, it prohibits the sale of any affected vehicle sitting on its dealerships' sales floors and lots. It is usually a safety—or emissions—related issue that causes the sales pause, and it is almost always for brand-new, never-before-sold cars and trucks.[1] According to media accounts, "Porsche's current stop sale is rather odd."[2]

3.      As background, Porsche's Sport Chrono Package comes standard with several vehicle models (*e.g.*, the 2016 Porsche 911 GTS) and is available as an option on others (*e.g.*, the 2014 Porsche Boxster S). The cost to add this package to a vehicle can be up to $3,000 alone, and it is among the automaker's most popular upgrades. The kit includes a digital and analog stopwatch, a graphic in the instrument cluster showing longitudinal and lateral acceleration, and a performance display for viewing lap times. In terms of performance, the package's features, when activated, elevate the baseline power and speed of a model with a sportier turning of the chassis, engine, and transmission.

4.      The Sport Chrono Package provides the driver with the ability to select between several driving modes via a switch. These different modes, "Normal," "Sport," and "Sport Plus,"

---

[1] https://www.autoblog.com/2021/02/01/porsche-stop-sale-sport-chrono/

[2] *Id*.

change the vehicle's performance profile.[3] As a Porsche dealership website explains, Normal is appropriate for everyday driving, Sport is for "backroads or canyon passes" and Sport Plus is described as the mode for "experiencing all of the performance your Porsche has to offer. The throttle response is instantaneous, shifts are lightning fast, and the overall steering and suspension feel is tight and responsive."[4] The driving modes are selected by a nob on the steering wheel, as pictured below.



5.      In November 2020, Porsche revealed that when some vehicles are placed in Sport Plus mode they "may" emit *more* nitrogen oxide ("NOx") than U.S. regulations permit. And while claiming that their cars and sport utility vehicles ("SUVs") remain safe to drive in Sport Plus mode, Porsche, through a spokesperson, admitted "they're just a little bit dirtier [for the environment]."[5] While withholding more detailed information about the potential scope and severity of the problem from Class members and the public, Porsche nevertheless took the unusual step of issuing the Stop Sale Order. In addition, "Porsche proactively informed authorities" about this issue.[6]

---

[3] *Id.*

[4] https://www.porscheirvine.com/research/driving-modes.htm

[5] https://www.driving.ca/porsche/auto-news/news/porsche-orders-stop-sale-on-top-trim-models-over-emissions-problems

[6] *See* Lee, *supra* n. 4.

6.     Prior to the Stop Sale Order, in August 2020, Porsche announced that it had launched an internal investigation into 911 and Panamera models for possible manipulation of engines "*developed* between 2008 and 2013" to improve emissions test data.[7] The issues stemmed from how these particular Porsche vehicles utilized specific hardware and software during emissions certification to beat the testing.[8] While Porsche paid $600 million for its cheating on *diesel* emissions tests in connection with its parent company, Volkswagen Group's, emissions-test cheating scandal, this is the first time *gasoline* engines were subject to scrutiny.[9]

7.     Any stop sale order is likely to have a significant, negative impact on the owners of affected vehicles, but that impact is even greater for Porsche owners, as Porsche operates the widely-used "Porsche Finder" web tool, as well as the "Porsche Approved" certification program, as alleged below. Because Porsche controls the most important marketplace for the purchase and sale of Class Vehicles, the Stop Sale Order has shut Plaintiff and Class members out of that critically-important marketplace.

8.     The effects of Porsche's decision to suspend the entire Porsche Approved market for the Class Vehicles—not just certain 911 and Panamera cars—are compounded by the fact that the COVID-19 pandemic has significantly constrained Porsche's manufacturing capabilities of new vehicles (2020-21). As a result, Porsche, and its dealership network, have been left with little to no inventory of vehicles to offer for sale making the *used* Porsche vehicle market extremely valuable to the dealerships. In fact, prior to the Stop Sale Order, Porsche dealerships were desperate for pre-owned vehicles to fill their inventories.

---

[7] https://www.caranddriver.com/news/a33753856/porsche-investigation-emissions-manipulation/ (emphasis added).

[8] *Id.*

[9] *Id.*

9.     After public reporting on the Stop Sale Order, Porsche—the parent corporation, as opposed to the dealerships—claimed that its 191 United States "dealer partners *are buying all used Porsche cars as they usually would*…what the dealers have [only] paused is selling the specific cars in their inventory affected by this until the [emissions fix] can be [made]."[10]

10.     Porsche's claim, however, is belied by Plaintiff's own experience in trying to sell his car after the Stop Sale Order and that of others who attempted to sell their cars to, or at, a Porsche dealership. It is clearly not in Porsche's independent dealerships' business interest to expend capital on cars they cannot offer for sale or that will likely be devalued as the result of a remedy to repair them.

11.     Porsche's handling of vehicle emissions and its decision to order a nationwide stop sale of the Class Vehicles has caused harm to Plaintiff and the Class. Similarly, Porsche's Stop Sale Order has indefinitely foreclosed the market for and significantly devalued Plaintiff's and the Class' Class Vehicles and resulted in lost sales opportunities. Plaintiff brings this action on behalf of himself and all others similarly situated seeking damages and all other available relief.

## **JURISDICTION**

12.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

13.     The Court has personal jurisdiction over Porsche Cars North America because it conducts business in Pennsylvania and has sufficient minimum contacts with Pennsylvania.

---

[10] https://finance.yahoo.com/news/porsche-issues-stop-sale-order-164400024.html

14.     The Court has personal jurisdiction over Dr. Ing. h.c.F. Porsche AG based on the contacts in this forum of its wholly-owned subsidiary and agent, Porsche Cars North America. On behalf of its parent company, Dr. Ing. h.c.F. Porsche AG, Porsche Cars North America is the exclusive importer of Porsche vehicles for the United States.[11] Dr. Ing. h.c.F. Porsche AG. exerts significant control over Porsche Cars North America and has directed its actions in this forum, including the acts alleged in this complaint. Under an Importer Agreement, Dr. Ing. h.c.F. Porsche AG controls the organizational structure and management of Porsche Cars North America. For example, it recently appointed one of its executives as the new president of Porsche Cars North America.[12] Dr. Ing. h.c.F. Porsche AG and Porsche Cars North America also share common trademarks and have a single brand identity.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this judicial district; because Plaintiff resides in this District; and because Porsche caused harm to Class members residing in this District.

## PARTIES

16.     Plaintiff, Bruce C. Turner, is an adult citizen who resides in the Commonwealth of Pennsylvania. Plaintiff Turner purchased, and still owns, two Class Vehicles: (a) a 2015 Porsche Boxster GTS equipped with the Sport Chrono Package that he purchased from Porsche of Conshohocken in October 2016 with 3,451 miles for $75,750; and (b) a 2016 Porsche Cayman equipped with the Sport Chrono Package that he purchased in February 2017 with 574 miles for

---

[11] https://www.porsche.com/usa/aboutporsche/porschecarsnorthamerica/
aboutporschecarsnorthamerica/

[12] https://newsroom.porsche.com/en/2020/company/porsche-cars-north-america-ceo-kjell-gruner-22329.html

$76,000. Plaintiff Turner sought to sell both Porsche vehicles in late 2020 / early 2021 to a Porsche dealer after the Stop Sale Order was issued. The dealership refused.

17.     Defendant, Dr. Ing. h.c.F. Porsche AG, is incorporated under the laws of Germany and headquartered in Stuttgart. It is a subsidiary of Volkswagen AG. Porsche AG directs the operations of Porsche Cars North America, which acts as its agent in the United States.  As a result, this Court has jurisdiction of Dr. Ing. h.c.F. Porsche AG.

18.     Defendant, Porsche Cars North America, Inc., is a corporation doing business in every state in the United States and the District of Columbia and is organized under the laws of Delaware with its principal place of business at One Porsche Drive, Atlanta, Georgia.

## FACTUAL BACKGROUND

### A.    The Porsche Market

19.     Porsche is one of the most iconic sports car makers of all time, with a lineup of luxury sports cars and SUVs, which Porsche advertises as featuring superb driving dynamics, impeccably crafted interiors, and extensive customizability. Porsche vehicles are both expensive (ranging typically in price from $60,000 to in excess of $250,000) and many are highly desired, whether sold brand new or as a used or pre-owned vehicle.

20.     Porsche's website claims that "[m]ore than 70 percent of all Porsche vehicles ever built are still on the road and therefore play a defining role in shaping the fascination of the brand." This is due in large part to the Porsche Classic program, an internal effort to maintain and revive Porsches.[13]

21.     As a result, many Porsche vehicles hold their re-sale value and some can, in fact, appreciate dramatically over time depending on the make, model, and build. Porsche's secondary

---

[13] http://www.speedhunters.com/2018/08/porsches-popular/

market's viability is critical to its customers, and its dealership network, as both customers and dealers sell and purchase vehicles in this market at a premium.

22.     Porsche also encourages prospective customers to purchase used vehicles from its dealership network. Porsche sells its used vehicles from its dealerships with a certified pre-owned guarantee, "Porsche Approved."[14] Porsche Approved means each used vehicle has "2 Years/Unlimited Miles Warranty coverage after the expiration of the new vehicle limited warranty or from the date of sale if the new vehicle limited warranty has expired"; "the vehicle meets the Porsche preparation standards"; "the certification vehicle has been inspected in compliance with [Porsche's] 111-point checklist"; "all work [was] performed by Porsche trained technicians"; and "only Genuine Porsche parts [were] used."[15]

23.     Some Porsche dealerships expressly discouraged customers from dealing in the private market for purchasing Porsche vehicles warning, "[w]hen you buy a car, especially a luxury car, from a complete stranger, you're carrying a lot of risk. You don't know how that car has been maintained. And even if that person has kept records, you have no way of knowing whether they're legit."[16]

24.     At least one Porsche dealership promotes the ease of returning to the Porsche dealership to sell a used Porsche as "quick and easy" and "the best choice."[17]  Further, it claims that "[s]elling to a dealership is a much smoother process than selling privately. It can create a

---

[14] https://www.porsche.com/usa/approvedused/porscheapproved/

[15] *Id.*

[16] https://www.porscheatlantaperimeter.com/new-or-used-how-to-decide-if-you-should-buy-a-new-or-pre-owned-luxury-car/

[17] https://www.porscheorlandpark.com/should-i-sell-my-car-privately-or-to-a-dealership/

much faster and less stressful experience for everyone involved. If someone wants to make a quick transaction, working with a local company is definitely the best option."[18]

25.     That same Porsche dealership warns of the pitfalls and hassles of selling privately, including "that individuals need to prepare a very detailed advertisement and take the time to write down all of the vehicle's details. Not only does the ad take time to create, but individuals need to do research and find out how much their vehicle is currently being sold for by other drivers. Once the advertisement is created, drivers have to be prepared to communicate and contact complete strangers regularly until the vehicle is sold. The importance of safety and ensuring proper payment cannot be emphasized enough. Individuals need to make sure that the person they are selling their vehicle to is honest and that they are paying them in a proper manner. Another problem with selling privately is that if the buyer has a problem with the vehicle, they will most likely keep contacting a person over and over again."[19]

26.     To advance its secondary market, Porsche developed an online platform called "Porsche Finder" that lets customers search for used vehicles across its entire U.S. dealership network.[20] The platform enables customers to search by vehicle model and year and includes additional filters for price, equipment and packages, as well as interior and exterior vehicle colors.[21]

27.     As described by one report, "Porsche Cars North America has a bigger aim than just creating a nationwide search feature. Porsche Finder is part of a broader strategy to create a

---

[18] *Id.*

[19] *Id.*

[20] https://techcrunch.com/2020/05/14/porsche-launches-online-platform-in-u-s-to/

[21] *Id.*

one-stop online shop where customers can complete the entire process of finding, buying and financing a [Porsche] vehicle."[22]

28.     The COVID-19 pandemic has had a considerable impact on the value of Porsche's secondary market. In 2020, Porsche reported that "[l]ike virtually every industry, the Global Covid-19 Pandemic wreaked havoc on automotive manufacturing supply chains, including the Porsche supply chains. Porsche assembly plants in Leipzig and Zuffenhausen were shut down for approximately 6 weeks from March 18th [2020] through the beginning of May, and continue to run at less than full capacity due to supply chain disruptions. What this has meant for Porsche shoppers is dwindling dealer inventories of every model, but especially the most popular models, *i.e.*, 911 [and] Panamera[.]"[23]

29.     Ultimately, in 2020, Porsche dealerships were left with little inventory of new vehicles for sale, making used vehicles and the secondary marketplace especially valuable to both buyer and seller.[24] According to Cox Automotive, as of September 2020, wholesale used-vehicle values for the entire used car market were up 15% compared with 2019.[25] Plaintiff's and the Class' used vehicles should, ostensibly, be more valuable than ever before.

**B.     Nitrogen Oxides and Emission Standards**

30.     It has long been understood that certain vehicle exhaust pollutants pose risks to the health of humans and the environment. The federal government has regulated certain pollutants,

---

[22] *Id.*

[23] https://www.porschelouisville.com/custom-porsche/

[24] As of this filing there are only twenty-six (26) new 2021 Porsche 911's available for sale across the entire United States. (https://finder.porsche.com/us/en_US/search/list?modelSeriesKeys=911&modelYear=min%3A2021) (last viewed February 26, 2021).

[25] https://www.npr.org/2020/10/28/927971920/a-pandemic-sticker-shock-used-car-prices-are-through-the-roof

like Nitrogen oxides ("NOx"), as far back as the 1970s. Nitrogen oxides have harmful direct effects on human health, and indirect effects through the damage they do to agricultural crops and ecosystems.

31.     NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are particularly at risk of health effects from these pollutants. As a ground level pollutant, NO2, a common byproduct of NOx reduction systems using an oxidation catalyst, is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are not sufficiently controlled, then concentrations of NO2 levels at ground level can be quite high, where they have adverse acute health effects.[26]

32.     In the early 2000s, federal regulators retooled their NOx regulatory framework with the adoption of a two-pronged approach. First, as with other pollutants, manufacturers must ensure that vehicles meet specified NOx thresholds on an average, fleet-wide basis. Second, manufacturers must also certify that vehicles meet emissions criteria on an individual basis— demonstrating that vehicles conform to the EPA's emissions caps applicable to the vehicle's smog rating standards, also known as the "bin."

33.     In 1995, in response to growing concern, Porsche added a new on-board diagnostics ("OBD") emissions monitoring system to its vehicles. The OBD continually monitored the operation of the entire exhaust system with catalytic converters and oxygen sensors, the

---

[26] *In re Duramax Diesel Litigation*, 2018 WL 3647047, at *4 (E.D. Mich.  2018).

functioning of the tank ventilation system with activated charcoal filters, the air injection system and the fuel system.

34.     In the ensuing years, Porsche continued to recognize, including in its 2016 Annual and Sustainability Report, that improving the environmental compatibility of its products throughout their lifecycle was critical to its success.[27]

35.     In a 2017 materiality study Porsche undertook, vehicle emissions—followed *only* by vehicle safety—was the second most important concern of those who participated in the study. Identified as a "primary strategic target" and as a key to maintaining "commercial relevance" lower emissions and environmentally friendly mobility were of Porsche's up most concern.[28]  Porsche, plainly, recognized the intrinsic value in its vehicles that offer both high performance and environmental compliance.

36.     To that end, Porsche includes with its vehicles a "Federal Emissions Performance Warranty" that for 8 years/80,000 miles warrants that "the automobile was designed, built and equipped to conform at the time of sale with all U.S. emissions standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."[29]

## C.     The November 2020 Stop Sale Order

37.     As was widely reported, Volkswagen Group, Porsche's parent company, in 2017 pled guilty to criminal offenses, including conspiracy to commit wire fraud, violations of the

---

[27]https://newsroom.porsche.com/dam/jcr:71bc8796-456a-42f8-9cfc-770f483bef3c/Porsche%20Annual%20and%20Sustainability%20Report%202016%20-%20Performance%20-.pdf  (Porsche 2016 Materiality Analysis).

[28]https://newsroom.porsche.com/en/sustainability/management-approaches/product-responsibility.html

[29] Porsche, New Car Limited Warranty & Customer Information, Model Year 2016, at 17.

federal Clean Air Act, and obstruction of justice, for installing emissions software on more than a half-million diesel cars manufactured between 2009-2015, which allowed the vehicles to sense the unique parameters of an emissions drive cycle set by the EPA. These so-called "defeat devices" detect steering, throttle, and other inputs used in the test to switch between two distinct operating modes.

38.     The subject Volkswagen diesel vehicles showed full compliance with all federal emissions levels during the actual testing (which was laboratory based). But when driven normally, the vehicle's control system switched to a separate mode—significantly changing the fuel pressure, injection timing, exhaust-gas recirculation, and, in models with AdBlue, the amount of urea fluid sprayed into the exhaust. While this mode likely delivers higher mileage and power, it also permits heavier NOx emissions (NOx), up to 40 times higher than the federal limit.

39.     Volkswagen paid $14.7 billion to settle civil litigation and agreed to, among other things, buy back the impacted vehicles.

40.     While certain Porsche *diesel* vehicles were included in the Volkswagen scandal,  in August 2020, Porsche announced that it was now being investigated by Germany's Transport Authority ("GTA") over suspicions that its *gasoline* powered models 911 and Panamera models built from 2008 to 2013, had illegal changes to the hardware and software that could affect emissions controls.[30] The government investigation reportedly came about after an internal Porsche probe uncovered "irregularities," at which point the automaker self-reported to the relevant authorities.[31]

---

[30]   *See*   https://www.thedrive.com/news/35956/porsches-gas-engines-investigated-for-possible-emissions-cheating

[31] *Id*.

41.     Without mention of the August 2020 GTA investigation into the 911 and Panamera models, months later in November 2020, Porsche *quietly* issued an internal, far broader "Quality Assurance Hold for certain used vehicles equipped with Sport Chrono," *a.k.a.,* the Stop Sale Order.

42.     Unlike the pending GTA emissions investigation, the Stop Sale Order was not limited to the 911 and Panamera models, it included a number of Porsche's 911, Panamera, Boxster, Cayman, and Cayenne models equipped with the Sport Chrono Package.

43.     The internal November 2020 instruction from Porsche to its dealership network was unequivocal:

**DEALERS SHOULD NOT SELL, LEASE, RENT OR LOAN ANY VEHICLES AFFECTED BY THIS ACTION IN DEALER INVENTORY UNTIL FURTHER NOTICE.**

44.     Since the Stop Sale Order, on information and belief, Porsche has expanded the list of vehicles subject to its Stop Sale Order several times to include more cars manufactured between 2012 and 2018 (including both of Plaintiff's cars). Porsche has not made the full list of vehicles publicly available.

45.     More than three months after the Stop Sale Order was issued, and once media reports surfaced, Porsche announced that it was working on a software update that it will apply, first, to the cars in its own dealerships' inventory so dealerships can offer those vehicles for sale again. Only after that time, Porsche explained, for owners like Plaintiff and the Class members

"the automaker will also perform the fix…as necessary [to their vehicles]."[32] Porsche did not provide a timeline for either event nor has there been any update.

46.     As of now, the Class Vehicles have little to no market value in the Porsche-created secondary marketplace. Nevertheless, the ultimate fix to bring the vehicles into compliance could have a substantial impact on the vehicle's performance and, consequently, its overall value.[33]

47.     Nearly all aspects of engine operation, including compliance with emissions standards, are controlled by the vehicle's Engine Control Unit. While some emissions control measures are passive in their nature, others require active control, which can sacrifice performance or efficiency in order to comply with government standards.

48.     Undoubtedly, altering a Class Vehicle's Engine Control Unit's initial programming to render the vehicle compliant with emissions standards (which they should have complied with initially) will have an impact on the vehicle's performance as originally advertised and as valued by those who may want to purchase such a vehicle in the future.

49.     And, lastly, although Porsche recognized the material nature to its stakeholders of the importance of vehicle emissions and environmental compliance, it publicly announced that the Class Vehicles are, in fact, dirtier for the environment when using the Sport Plus mode, something Porsche knew or should have known at the time it certified the vehicles compliant with applicable emissions standards.

---

[32]https://www.businessinsider.in/thelife/news/porsche-orders-stop-sale-on-certain-models-for-performance-option-causing-them-to-create-excess-emissions/articleshow/80486032.cms

[33]https://www.forbes.com/wheels/news/chip-shortages-force-automakers-slash-production/ ("Semiconductors used to operate today's engines and transmissions to control emissions and fuel economy and improve performance and comfort.").

## CLASS ACTION ALLEGATIONS

50.      Plaintiff brings all claims as class claims pursuant to Fed. R. Civ. P. 23.   The

requirements of Fed. R. Civ. P. 23(a), and (b)(3) are met with respect to the Class defined below:

> All persons in the Commonwealth of Pennsylvania who (a) are
> current owners of a Class Vehicle, or (b) sold a Class Vehicle on or
> after November 12, 2020. Excluded from the Class are
> Defendants' officers.

> The Class Vehicles comprise the following:

| Model Years | Model | Equipment |
|---|---|---|
| 2012-2016 | 991 I Carrera<br>991 I Cabriolet<br>991 I 4<br>991 I 4 Cabriolet<br>991 I S<br>991 I S Cabriolet<br>991 I 4S<br>991 I 4S Cabriolet | Only if equipped with optional Sport Chrono Package |
| 2015-2016 | 991 I GTS<br>991 I GTS Cabriolet<br>991 I 4 GTS<br>991 I 4 GTS Cabriolet<br>991 I 4 GTS Targa | All |
| 2015-2016 | 991 I Targa 4<br>991 I Targa 4S | Only if equipped with optional Sport Chrono Package |
| 2015-2017 | E2 II Cayenne S | Only if equipped with optional Sport Chrono Package |
| 2016-2018 | E2 II Cayenne GTS | Only if equipped with optional Sport Chrono Package |
| 2014-2016 | Panamera G1 II Turbo<br>Panamera G1 II Turbo Executive | Only if equipped with optional Sport Chrono Package |
| 2014-2016 | Panamera G1 II Turbo S | All |

|  | Panamera G1 II Turbo S Executive |  |
|---|---|---|
| 2013-2014 | 981 Boxster S<br>981 Cayman S | Only if equipped with optional Sport Chrono Package |
| 2015[34] | Boxster GTS | Equipped with Sport Chrono |
| 2016[35] | Cayman | Equipped with Sport Chrono |

### A.   Numerosity

51.    Plaintiff, on information and belief, believes and therefore avers that there are at least hundreds of members of the Class, making joinder impracticable. The Class is composed of an easily ascertainable, self-identifying set of persons who own, or owned, the Class Vehicles.

### B.   Commonality

52.    There are numerous questions of law and fact common to Plaintiff and the Class, including the following:

(a)    Whether Defendants represented that the Class Vehicles were of a particular standard, quality, or grade when they were not and/or when Defendant knew or should have known that they were of another standard, quality, or grade;

(b)    Whether Defendants misrepresented the viability and marketability of the Class Vehicles because the vehicles did not comply with emissions standards;

(c)    Whether Defendants misrepresented that its dealerships would continue to purchase Class Vehicles despite the Stop Sale Order;

---

[34] These vehicles were not part of the November 2020 Stop Sale Order.  Plaintiff, however, was advised by a Porsche dealership that the Stop Sale Order has been expanded several times and both of his vehicles are now included.

[35] *Id.*

(d)     Whether Defendants misrepresented that Class Vehicles were designed, built and equipped to meet U.S. emissions standards;

(e)     Whether the Class Vehicles are merchantable in light of the Stop Sale Order;

(f)     Whether the Class Vehicles are fit for the particular purpose for which Defendants market and sell; and

(g)     Whether Defendants breached its Federal Emission Design and Defect Warranty because the Class Vehicles violate U.S. emissions standards and/or breached the covenant of good faith and fair dealing with respect to that warranty.

## C.    **Typicality**

53.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class members, has been damaged by the Defendants' conduct in the same manner as the other Class members.

54.    Furthermore, the factual bases of Defendants' conduct are common to all Class members and represent a common thread resulting in injury to all members of the Class.

## D.    **Fair and Adequate Representation**

55.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who is experienced in class action litigation.  Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

## E.    **The Prerequisites of Rule 23(b)(3) are Satisfied**

56.    The questions of law and fact common to Class members predominate over any questions which may affect only individual members.

57.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation.

58.     The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants.  In contrast, a class action presents far fewer management difficulties, conserves judicial as well as the parties' resources, and protects the rights of each Class Member.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET SEQ.*)

59.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

60.     Plaintiff and Class members purchased or leased their Class Vehicles primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

61.     All acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

62.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits unfair or deceptive acts or practices, including: (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made; and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

63.      In the course of business, Defendants failed to comply with their guarantees related to the Class Vehicles' emissions standards. Defendants specifically warranted that the Class

Vehicles were designed, built, and equipped to meet all U.S. emissions standards, when the otherwise did not.

64.     As a direct and proximate result of Defendants' violations, Plaintiff and the Class have suffered injury-in-fact and/or actual damage, including but not limited to, diminished and/or total lost value of their vehicle as well as the lost opportunity to sell their Class Vehicles.

65.     Defendants are liable to Plaintiff and the Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a).

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

66.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

67.     An implied warranty of merchantability exists with respect to the Class Vehicles, namely that they complied with emissions standards and had value that could be traded or sold; they were advertised, promised, and guaranteed as merchantable.

68.     Defendants breached the implied warranty of merchantability as to the Class Vehicles because they do not pass without objection in the vehicle market. Indeed, Defendants, themselves, closed the largest secondary market for the Class Vehicles' sale via the November 2020 Stop Sale Order. The Stop Sale Order is tantamount to an admission that the vehicles are not, in fact, merchantable.

69.     Plaintiff and the Class have suffered and will continue to suffer damages as a result of Defendants breach of the implied warranty of merchantability, including but not limited to, diminished and/or lost value of the Class Vehicles, as well as the lost opportunity to sell their vehicles.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE

70.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

71.     Defendants were aware that Plaintiff's and Class members' Class Vehicles were required to fit a particular purpose of transportation, performance, environmental compliance, brand recognition, and sustained value.

72.     Defendants breached the warranty of fitness for a particular purpose because the Class Vehicles do not satisfy the particular purpose associated with the Porsche brand.

73.     Plaintiff and the Class suffered, and will continue suffer, damages as a result of Defendants' breach of the implied warranty of fitness for a particular purpose, including but not limited to, diminished and/or lost value of the Class Vehicles, as well as the lost opportunity to sell their vehicles.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

74.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

75.     For each Class Vehicle, Porsche includes a New Car Limited Warranty & Customer Information document, which includes a Federal Emissions Design and Defects Warranty that spans 8 years/80,000 miles.

76.     The Federal Emission Design and Defects Warranty states specifically, "[Porsche Cars North America] warrants to the owner of this car that the automobile was designed, built, and equipped to conform at the time of sale with all U.S. emissions standards applicable at the time of

manufacture, and is free from defects in material and workmanship which would cause it not to meet those standards."

77.    Defendants breached this express warranty when, in November 2020, it issued the Stop Sale Order and disclosed that the Class Vehicles may not meet U.S. emissions standards when the Sport Plus mode is selected.

78.    Defendants have similarly breached the implied covenant of good faith and fair dealing in their performance under the Federal Emission Design and Defects Warranty.

79.    Plaintiff and the Class were parties to Porsche's Federal Emissions Design and Defects Warranty.

80.    Porsche knew or had reason to know that its customers, including Plaintiff and Class members, believed that it built and sold a vehicle commensurate with its cost and reputation as a high-performance luxury vehicle that was also built and designed to be environmentally conscious.

81.    Specifically, Porsche counted on the fact that its customers heard its representations and warranties concerning the vehicle's performance, reputation, brand recognition and environmental compliance. Porsche expressly advertised its secondary market, the longevity and value of its vehicles over a period of years. These promises and warranties tended to induce the customers and became part of the basis of the bargain of the bargain.

82.    Porsche's duties of good faith and fair dealing included obligations on its part to take steps to preserve the Class Vehicles' market and value.  Porsche breached its duties and warranties by failing to do so and publicly denouncing the Class Vehicles as harmful to the environment.

83.     As a direct and proximate result of the Defendants' breach, Plaintiff and the Class have suffered damages, including but not limited to, diminished and/or lost value of the Class Vehicles, as well as the lost opportunity to sell their vehicles.

**WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class, respectfully requests that the Court:

(i)     grant class certification of the Class, designate Plaintiff as the name representative of the Class, appoint his counsel as Class Counsel;

(ii)     enter judgment in favor of Plaintiff and the Class;

(iii)     award Plaintiff and the Class all available damages, trebled, including but not limited to, damages for the diminished and/or total loss of their vehicles value, as well as damages for loss of opportunity caused by the Stop Sale Order;

(iv)     award both pre-and post-judgment interest on amounts awarded;

(v)     award Plaintiff and the Class their costs of suit and reasonable attorneys' fees; and

(vi)     award such other or further relief as the Court may deem appropriate, just and equitable.

Respectfully submitted,

Date: February 26, 2021                    By: ___s/Patrick Howard___
                                           Robert J. Mongeluzzi
                                           Simon Bahne Paris
                                           Patrick Howard, PA ID #88572
                                           **SALTZ, MONGELUZZI, &**
                                           **BENDESKY, P.C.**
                                           One Liberty Place, 52nd Floor
                                           1650 Market Street
                                           Philadelphia, PA 19103
                                           Tel:     (215) 575-3985
                                           rmongeluzzi@smbb.com
                                           sparis@smbb.com
                                           phoward@smbb.com

Roberta D. Liebenberg, PA ID # 31738
Gerard A. Dever, PA ID # 85291
Ria Momblanco, PA ID # 201818
**FINE, KAPLAN & BLACK, RPC**
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
Tel: 215-567-6565
Fax: 215-568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com
rmomblanco@finekaplan.com


DANIEL E. GUSTAFSON
RAINA C. BORRELLI
LING WANG
**GUSTAFSON GLUEK, PLLC**
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
rborrelli@gustafsongluek.com
lwang@gustafsongluek.com


Michael J. Boni
Joshua D. Snyder
Benjamin J. Eichel
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: (610) 822-0200
mboni@boniack.com
jsnyder@bonizack.com
beichel@bonizack.com

*Counsel for Plaintiff and the putative Class*